IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**KENDRA DRONE-NORTH**                                                              **PLAINTIFF**

V.                          **CASE NO. 4:24-cv-00405-LPR**

**ARKANSAS BUREAU OF
LEGISLATIVE RESEARCH**                                                              **DEFENDANT**

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMMARY JUDGMENT**

Defendant Arkansas Bureau of Legislative Research ("BLR") is entitled to summary judgment because the undisputed material facts prove: (1) Plaintiff Kendra Drone-North ("North") failed to exhaust administrative remedies as to any claims based on events before November 3, 2022; (2) BLR did not discriminate against North as to her pay;[1] (3) North's failure to promote claim fails because North was not qualified to be a Legislative Analyst and more qualified applicants were selected; (4) North was terminated after an independent investigator determined that North violated multiple BLR policies; and (5) BLR did not retaliate against North.

Most if not all of North's responses to BLR's Statement of Undisputed Material Facts fail to meet proof with proof as required to demonstrate a material issue of disputed fact. Even where North denies a statement of undisputed material fact, the denial is not effective without proof. Rule 56(c) requires "[a] party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute ...." *Bosch v. Thurman*, No. 4:22-CV-00677-LPR, 2024 WL 841252, at *3 (E.D. Ark. Feb. 28, 2024). A non-moving party's factual submission

---

[1] In BLR's Motion for Summary Judgment (Doc. 17) there is a typo in paragraph 4 which should say, "The undisputed material facts demonstrate that Plaintiff was *not* discriminated against by being paid less than similarly situated white employees." BLR believes this point is clear from BLR's Brief in Support of Motion for Summary Judgment (Doc. 19).

in response to a moving party's statement of undisputed material facts must not only dispute the fact, but "must support the assertion by ... citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute ...." *Id*. Failure to do so results in the facts being undisputed.

**(1)     North's allegations regarding events that occurred outside the limitations period are barred and cannot be the basis for a prima facie case of discrimination.**

Title VII requires an employee complaining of discrimination to follow administrative procedures before filing a lawsuit in federal court. *Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 911 F.3d 530, 534 (8th Cir. 2018). To exhaust administrative remedies, a plaintiff must file a charge of discrimination with the EEOC within 180 days of an allegedly unlawful employment practice. *Id*. Summary judgment must be granted where an employee failed to timely file an EEOC Charge.

North spends considerable space in her Response alleging all kinds of discriminatory practices and decisions from 2014 to 2022. Doc. 28. North argues that other minority employees' complaints about discrimination are proof of discrimination here. North is mistaken.

While a plaintiff may (under certain circumstances) use evidence of time-barred discriminatory conduct to meet her burden of persuasion[2] in a discrimination case, time-barred conduct cannot establish a prima facie case of discrimination. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 (11th Cir. 1998) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558,

---

[2] BLR is not waiving argument that time-barred events should be excluded from a trial should the Court deny BLR's motion for summary judgment.

97 S. Ct. 1885, 1888, 52 L. Ed. 2d 571 (1977)). Plaintiff's time-barred evidence of discrimination is not sufficient to create a prima facie case.[3]

North filed her Charge with the EEOC on May 2, 2023, and Amended the Charge on May 24, 2023. SUMF, ¶ 47. The unlawful employment practices alleged by North must have occurred after November 2, 2022 (180 days prior to May 2, 2023). Any claims arising from employment decisions made before December 11, 2022 are untimely. North's Complaint alleges that North was passed over for promotions in 2015, 2016, 2018, and 2019. North failed to exhaust administrative remedies as to any alleged unlawful employment practices before November 2, 2022. Therefore, BLR is entitled to summary judgment as to North's allegations before November 2, 2022.

**(2)     BLR did not discriminate against North as to her pay**

The undisputed material facts show that North made a higher salary than white Administrative Assistants every year she was employed at BLR. In her response, North does not argue otherwise. North fails to identify any year wear she did not have a higher salary than at least one white Administrative Assistant. Every year North was employed with BLR, she made a higher salary than white Administrative Assistants. North references "governor salary increases" several times in her Response. North is mistaken because BLR is part of the Legislative Branch, and the Governor does not set salaries for BLR. North claims that, in 2020, both Gina Seaton and Wanda Manees received a 10% increase while North received an 8% increase. Doc. 28, p. 17. The undisputed material facts show that Gina Seaton was no longer an Administrative Assistant in 2020. Doc. 17-1, p. 16. The undisputed material facts show that Wanda Manees retired in 2020. Finally, the undisputed material facts demonstrate that North received a 9% increase (not 8%) due

---

[3] BLR denies that it ever discriminated against any employee and the baseless allegations on which North relies in her Response should not be considered by the Court in determining whether the undisputed material facts establish a prima facie case of discrimination.

to receiving an oral reprimand for unprofessional interactions with her supervisor. Doc. 17-6, p. 4. At any rate, North received higher increases and was paid a higher salary than multiple white Administrative Assistants in 2020. SUMF, ¶ 11. BLR is entitled to summary judgment as to North's race-based wage discrimination claim.

**(3) North's failure to promote claim fails because North was not qualified to be a Legislative Analyst and more qualified applicants were selected.**

BLR is entitled to summary judgment as to North's discrimination claim based on a failure to promote. North's failure to promote claims before November 2, 2022, are barred as North did not exhaust administrative remedies as to those claims. That leaves North's claim that she was not selected for promotion into a Legislative Analyst position in October 2022[4] and November 2022.

In her Response, North argues that Caitlyn Steele ("Steele") was promoted ahead of North even though North had worked at BLR since 2006, had trained analysts, and worked in the capacity as an analyst. While BLR disputes that North trained analysts and worked in the capacity as an analyst, this is not a material issue of fact because the undisputed material facts show that North was not qualified because of her negative interactions and poor attitude and that Steele and Ray Terry were more qualified than North.

**(a) North was not qualified for the legislative analyst position due to her negative interactions and poor attitude.**

North argues that during her career with BLR she received excellent performance evaluations. As Director Garrity set forth in her declaration, North was an acceptable administrative assistant, but never showed herself have the qualities necessary to be a legislative analyst due to a history of negativity and harassing behaviors. Doc. 18, ¶¶ 18 & 19. North points

---

[4] North's claim that she wasn't promoted for a position she interviewed for on October 25, 2022, isn't barred for failure to exhaust administrative remedies because North was informed that she wasn't selected for the position on November 3, 2022.

to her Employee Evaluations from May 1, 2018 to April 30, 2022 in support of her argument. While parts of each evaluation show North was a good administrative assistant, other parts of each evaluation support BLR's position that North had a history of negativity and poor attitude that was disqualifying for promotion to legislative analyst. For example, the Evaluation for May 1, 2018 to April 30, 2019, states:

> Kendra has not been shy in expressing her thoughts on what she views as pay inequity and stays informed regarding the salaries of various employee. She cites helping new analysts learn their job duties as not part of her regular job duties. We have discussed this before and my position is that because the analyst and AA are a team, sharing knowledge should be an expectation just as when an analyst shows an AA how to format a document or other Word/Excel feature. In addition, many analysts now prepare meeting agendas which traditionally was the responsibility of the AA.
>
> It is my hope that Kendra moves past bringing up what occurred over nine years ago. Annual self-evaluations cover a one-year period and there is no need to rehash the same events over and over.

Doc. 17-14. North's Employee Evaluation for the period from May 1, 2019 to April 30, 2020, in part, states:

> While Kendra's work product is generally excellent, an area of improvement is Kendra's willingness to assist with additional tasks. If asked, Kendra will step in and help, but it is my hope that she can do so without being asked. In addition, Kendra's communications with her supervisors are at times defensive and relayed in a negative tone. My goal for Kendra for the following year is that we can have more positive interactions with each other and come to a place of understanding.

Doc. 17-15. North's Employee Evaluation for the period from May 1, 2020 to April 30, 2021 notes that a verbal warning was issued to North for unprofessional interactions with her supervisor. Doc. 28-1. While North's Evaluation for the period from May 1, 2021 to April 20, 2022 is positive; North's negative interactions and poor attitude are documented extensively.

Estella Smith contemporaneously documented interactions with North from prior to 2019 until the end of 2021. On October 9, 2019, Smith stated:

> 10-9-19 – I asked Kendra about the status of the Chair's approval for Rep. Marsh Davis who signed the chamber sheet rather than the per diem. She replied, with an attitude, that I didn't send the email to her (I sent it to Barbara and Barbara sent it to her). I told her that didn't matter because she received it. She also added that others have forgotten as well and that it was ok for members to sign both sheets. I felt that she was very defensive and pointed out the mistake of others rather than herself. I checked with Andrea Barksdale, our Chief Fiscal Officer, who confirmed it is not ok to sign both.

Doc. 17-11, p. 5. On May 12, 2020 Smith noted:

> 5-12-20 (Mon.) – Kendra left after her committee meeting ended; she called me on her way home (around 2:30) stating Sherri was trying to take advantage of her by getting her to come in Tuesday-Friday. She said Sheri set her up and told her that Juanita was supposed to come in but now can't. Kendra accused Sheri of withholding information (that Sheri knew the AAs would be returning next week; I advised Kendra that I didn't confirm with Sheri the AAs would be coming in next week until after the both of them returned from the meeting. I tried to assure her that Sheri was not trying to take advantage of her. She said she didn't respond to Sheri's comment on the way out because she was too upset. (Kendra was aware that the receptionist had to leave early and there were no other AAs present; she didn't ask if she should stay; Sheri and I were the only committee staff present. Sheri staffed the reception desk the remainder of the afternoon.

Doc. 17-11, p. 7. On June 4, 2020, Smith noted that North rarely responded or volunteered to cover the phones while the regular receptionist was at lunch, had to be repeatedly directed to follow the chain of command, refused to answer her supervisor's questions, and was defensive when asked about an error noting there is always an excuse rather than owning up to a mistake. *Id*. at 11. Smith believed North had hostility toward Sheri Thomas. *Id*. at 12.

Director Garrity documented interactions with North. On May 14, 2020, Director Garrity noted issues with North's interactions with her supervisor, Shari Thomas. Director Garrity said, "this behavior by Kendra or any other person is not acceptable and must be addressed." Doc. 17-9, p. 1. On May 18, 2020, Director Garrity wrote, "What I thought was a bad attitude that needed to be addressed by a verbal warning has now turned into behavior that is bordering on insubordination." *Id*. On May 20, 2020, Director Garrity noted that North's "work product is good but her attitude is beyond poor and cannot continue." *Id.* at 2. On July 16, 2020, Director Garrity wrote:

> I met today with Matthew Miller and Jill Thayer to go over the results of their investigation. They found that Sheri created an unprofessional environment for her staff, that Estella was advised of this by other staff members and did nothing about it, that there was no harassment in the legal sense but that Sheri's behavior and Estella's lack of action created an environment in which the staff are miserable. Kendra asked that the written reprimand be removed. I still beleive that Kendra's lack of professionalism and her failure to respond to Sheri's question about whether she believed she had COVID-19 merits disciplinary action. the problem is that in the written reprimand, Estella and Sheri included language regarding Kendra bypassing Sheri. Jill and Matthew found that Kendra had a compelling reason to do this in light of how she felt Sheri treated her. Therefore, my decision is to remove the written reprimand and replace it with a verbal reprimand addressing only her conversation she had with Sheri about being a Christian and feeling as if Sheri was setting her up as well as failing to respond to her email question. With regards to Sheri, her written repriman is in order. I truly feel that Sheri just needs to be mentored better. We will provide a coach for her as well as I want a counselor to work with Sheri and Kendra and then Kendra and Estella. There is a real personality conflict between them that they all need to get past. Kendra needs to learn to be respectful towards Sheri and Estella and they need to learn how to better interact with Kendra and not let her annoy them. As for Estella, her lack of leadership in this area is disappointing. On many occassions employees went to her to complain about Sheri and to seek some resolution. Estella did nothing about this. I believe that her many years of having to respond to Kendra has affected how she interacts with her. The question is what is the appropriate disciplinary action. I am at a loss. I have called Kathleen McComber for guidance to work through this. I am waiting for Jill and Matthew to send me the revised memos to Sheri and Kendra so I can forward to her and then we will have a discussion.
> 07/16/2020  My goal is to be consistent with how I treat this issue.

*Id*. at 3. On July 17, 2020, Director Garrity noted nothing seems to be easy with North and she seems to not be happy until she is given what she wants. *Id*. On July 18, 2020 Director Garrity noted:

> 7/18/2020  Nothing in particular, just a nagging attitude with Estella about her performance evaluation. She wrote a 4 page response to Richard and then she asked to be moved to work with Barbara Brown who was chaning assignments. Estella said no, but she could apply if there was an opening. Kendra said that she was going to apply for the vacant analyst position. It is my thought that Kendra's attitude is not the kind I want as an analyst.

*Id*. at 1. On October 6, 2021, Director Garrity noted that Kendra refused to assist with a committee when asked by Sheri Thomas "because she didn't feel comfortable around other members."

Jill Thayer, BLR's Chief Legal Counsel, made contemporaneous notes about issues with North. On August 4, 2020, Thayer noted that North always believes there is a conspiracy against her.[5] On November 30, 2021, Thayer noted:

> I asked Kendra whether she could point out to me any white employee recently hired tha[t] was chosen over a more qualified Black applicant. She said that she "can't speak to that" I asked if she had any specific examples related to her comments, and she did not.

Doc. 17-12, p. 6. On February 20, 2023, Thayer noted:

> On a personal note, I am exhausted by the never ending complaints from Kendra and Barbara. They now take every statement or action that they don't like as discriminatory against them. I'm not sure how Sheri functions anymore under the incredible stress of tiptoeing around them. At some point, surely, this becomes workplace bullying?

---

[5] The complete August 4, 2020 entry by Thayer is set out in BLR's Brief in Support of Motion for Summary Judgment. Doc. 19, p. 8.

7

Doc. 17-2, p. 8.

Sheri Thomas (North's supervisor) made contemporaneous notes about her interactions with North. On February 3, 2020, Thomas noted:

> 2-3-2020 – I asked Sheila if Kendra was at lunch. Kendra called me shortly after I stated I was just checking on her. I know Shelia informed Kendra that I was looking for her even though, I did not ask Shelia to let her know. A few of times, in the last couple of weeks, Kendra has been gone for lunch for an hour and a half and submitted leave once she returned. I want to ensure that we are all following the leave policy. Once Kendra returned from lunch, she was upset. She stated if I was singling her out that I needed to check on everyone. I told her I was walking over there and she and Barbara both were gone. That's why I questioned whether she was at lunch or not.

Doc. 17-8, p. 2. On March 6, 2020, Thomas recorded the following interaction with North:

> 3-6-2020 – Phil and I interviewed Kendra at 2:30 p.m. for the vacant legislative analyst position in the BLR library. She was not able to give us specific examples of situations of the questions we asked during her interview. I informed her that we are looking for some specific examples and any examples we hear will not leave this room. She was still vague in her responses. When asked "what would your supervisors say is one area you need improvement in when it comes to your work product?" She asked if I was referring to myself. She stated because I had not be her supervisor for very long or was I asking about Estella. I told her the question really is more about what you think you need improvement on. Once we finished asking the interview questions Kendra had some questions for me. She had printed the job posting and had a copy of the job description. She asked why I had sent the job description with the email sent internally and she mentioned that she felt as I was requiring more from internal candidates than from external ones. I assured her that was not the case and that we do not normally send the job description to external candidates. She mentioned that it would be better to hire someone with knowledge of the essential functions listed on the job description. Additionally, she questioned why the job posting and the job description were not the same. I informed her the job posting is a summary of the job description. She questioned how many people we were interviewing and why. Whose decision was it to advertise external and internal. After the interview Phil stated "wow she was confrontational" I told Phil that is "just how she is with me." I did not know what else to say to him.

*Id.* at 3. On March 10, 2020, Thomas noted the following:

> 3-10-2020 – Estella informed me that Kendra went to speak to her about the situation on 3-9-20. Kendra did not like that I talked to her in the open and said I should have asked her to come to my office. However, I had no idea that asking Kendra for her reasoning of using a one hour and 45 minutes of overtime would cause such a problem.
>
> I asked Kendra in to my office. I apologized to Kendra for making her feel like I was grilling her. I did not agree with her using 1.75 hours of overtime and I should have handled it different. She told me that since, I am the leader that I should have come apologize to her first and that she felt like I was avoiding her. She also stated that, I have personal relationships with people in the office and do stuff outside of work with them. I am not sure why she mentioned this and she never finished her thought or how it relates to her using overtime.
>
> She did mention during this conversation that she would respect me as her supervisor but she was not going to kiss anyone's ass. We ended the conversation on a pretty good note that we are going to move forward. Kendra seems to have a bad attitude with anyone that is her immediate supervisor. I feel no matter what I do, Kendra will have a problem with it.

*Id*. at 4. Thomas noted the following on April 14, 2020:

> Estella and I talked about Kendra's lack of respect for me in this position. She has continued to go to Estella instead of coming to me first. She would have never went to Richard. We also discussed that her comments about the salary of others is inappropriate, she's been disrespectful, and she continues to bring up the past instead of focusing on the current review period. Since I have been her supervisor she has been distance, does not call to let me know when she will be late or when she's coming back from lunch late, she defensive, confrontational with me when I asked the receptionist if she was at lunch and she thought I was targeting only her, she questioned me if it was my decision to open the vacant analyst position externally instead of internally, and questioned me whether was my decision to use old application when I interview for the other vacant position. Kendra thinks that everyone is out to get her and she does not realize what is appropriate to ask and was is not.

*Id*. at 5. On May 12, 2020, Thomas noted:

> are out sick. Before I could finished explaining that she would have to come to work after all, she became visibly upset and said "you've had this planned all along", and continued to speak in an indignant tone of voice without giving me an opportunity to explain why the circumstances were now different. She was implying that this was a plot against her and that I was not being fair to her.
>
> She also mentioned that she found out "something" the day before that I was keeping from her and that I was not being honest with her. She stated "if we claim to be Christians than we always need to be one." I asked her to explain what she felt like, I was hiding from her, but she would not tell me. She kept saying this is not her week and that she volunteered to help me at the meeting and that I had not been honest with her. I never gave her a week for certain because we did not know when everyone would be expected to return to work or if an AA that was tentatively scheduled ahead of someone else decided to use leave than that would change the schedule for everyone following that person. She continued to interrupt me and stated "I am not going to argue with you and I will call Estella." I told her I was not trying to argue with her and I went back to the front reception desk. I knew she would not be happy but I was surprised by her behavior.
>
> When Kendra was leaving, I said see you tomorrow and she kept walking and I asked if she was going to keep walking and she never answered or looked back. I do not think Kendra understood that with Shelia being sent home and Juanita out on medical leave this created a gap in coverage and the next two AA's on the list would need to be called in. Additionally, Kendra knew we were short staff with Sheila leaving and did not bother to ask if she needed to stay to help out.

*Id*. at 7. On May 13, 2020, Thomas wrote that North seems to have a hard time with Thomas being North's supervisor and refuses to communicate with Thomas. On May 14, 2020, Thomas wrote that North's actions and total disregard for Thomas as North's supervisor needed to be addressed.

*Id*. at 8. On May 19, 2020 Thomas noted:

> Kendra continues disregard the chain of command after being told numerous times by Estella that she does not need to let her know that she will be late. And she continues to ignore instructions from me as her immediate supervisor. If Kendra continues to refuse to follow my instructions this will lead to undermining my level of authority and ability to manage the Committee Staff Section. No one else in the committee staff section includes Estella on text messages sent to me in regards to them being late or missing work. I do not understand why this continues to be an issue for Kendra.

*Id.* at 10. Thomas then noted that North's behavior remains disruptive and has affected morale and she has continued to undermine my authority." *Id* at 12. On May 20, 2020, Thomas wrote, "I feel she [North] is trying to 'run' me off or just wants to show me that she does not have to listen to me. Kendra does not seem to take responsibility for her mistakes." *Id*. The entry of May 22, 2020 states:

> 5-22-2020 – JPR meeting all day – Before the meeting started Kendra kept asking Estella questions regarding the seating chart. The seating chart was incorrect but I did not want to say anything because I felt like it would upset Kendra. I was glad Estella also notice the seating chart was incorrect and started fixing the nameplates. Also, we could not find the agendas for the public and I felt Kendra was accusing me of purposefully misplacing the agendas or taking them off the cart, as I was the one to bring the cart to Room A; and Tracy and I were the ones to place the packets at the member's desk. Kendra called Shelia to make more agendas. I mentioned to Kendra that the agendas are probably stacked on top of one of the packets. I checked the packet on seat #22 and found the agendas.

*Id.* at 13. On July 21, 2020, Thomas wrote:

> 7-21-2020 – Marty stopped by my office to give me the following language to put in Kendra's review – "While Kendra's work product is generally excellent, an area of improvement is Kendra's willingness to assist with additional tasks. If asked, Kendra will step in and help, but it is my hope that she can do so without being asked. In addition, Kendra's communications with her supervisors are a times defensive and relayed in a negative tone. My goal for Kendra for the following year is that we can have more positive interactions with each other and come to a place of understanding."

*Id.* at 16. An entry on July 20, 2022 states:

> 7-20-2022 - I called Barbara Brown, Legislative Analyst, to let her know that I should not have approved the travel request to leave the office at 7:30 a.m. to travel to Conway for a 10:00 a.m. meeting. She did not understand why it matters and she stated that she was not planning to leave at 7:30 a.m. Barbara said she would let Kendra know. Kendra called to say that she did not care about the overtime because she's not paid what she should be paid. Kendra repeated herself at least three times. She stated that she would come in at her normal work time at 8:30 a.m. I informed her they need to put 8:00 a.m. on the travel request. I denied her request to return at 4:00 p.m. and stated to change the return time to 2:30 p.m. as that seems reasonable to me.

*Id.* at 20. Thomas, on September 7, 2022, wrote, "Kendra made a comment that she thought I was upset because I used an exclamation point at the end of my sentence in an email regarding coverage for the front desk. It seems that Kendra takes things wrong even when I am expressing excitement that they had worked the schedule out without my involvement." *Id.* at 20. On September 13, 2022, Thomas noted:

> 9-13-2022 – I sent an email that the admins are required to attend the upcoming Grammar classes. Kendra called asking me why the admins are only required as there are some analysts that need to take the class. I advised her that some analysts were taking the class and anyone that I felt should take it would be required. She immediately sent me an email asking if admins in all division are required to attend the classes. This seems like a pattern for Kendra that she is concerned with what other employees are doing or not doing. (email in file)

*Id*. Thomas noted that in September 2022 North brought Caitlyn Steele to tears:

> Friday, September 30, 2022 – Cait Steele, Administrative Assistant to the Administrator, mentioned that when she sends the front desk calendar to the admins that Kendra has something negative to say. Cait was in tears and frustrated because of this. She stated that would get me to approve the calendar before sending it out. She feels that she can't confidently do her job as there seems to be an issues every month. Kendra complained this month because Cait did not put the new admin on the calendar for the month of October. Cathy Lett, Administrative Assistant, is starting on October 4 and Cait said that normally the new person is not added to the calendar until the next month.

*Id*. On October 31, 2022, Thomas noted that North complains no matter what Thomas does. *Id*. at 21. On December 14, 2022, Thomas wrote that North's common practice is to make an easy procedure or process more complex just to be difficult. *Id*. at 22. On January 30, 2023, Thomas noted:

> Kendra is creating a hostile work environment by spreading rumors and trying not only to create animosity between my AA (Ashley Miller) and myself but with other employees. I feel that Kendra is spreading rumors because she did not get hired as an analyst in December when I hire Raymond Terry. After hearing this information from Ashley, I felt anxious and upset about the rumors and Kendra's false narrative she's providing to staff. This effects my ability to supervise employees and allows for the staff to have doubt in my ability to treat employees fairly.

*Id*. at 24. Thomas noted that another African American employee told Thomas that North was trying to put a wedge between Thomas and the other employee. *Id*. On February 7, 2023, it was noted nothing is easy with North and she thinks that she knows better than anyone and has a sense of arrogance in her tone and delivery. *Id*. Nothing is easy with her. *Id*.

On February 10, 2023, Thomas wrote:

> Kendra asked whether I had recommended her for a promotion since I became the administrator. I initially said that Jessica Whittaker, Assistant Director of Research Services, and I make the hiring decisions together. She stated that she has worked here for 16 years, is a great employee and mentors new administrative assistants and analysts and has not been promoted. I suggested to her, a couple of times that this conversation should be with Jessica Whittaker and/or Marty Garrity, Director, BLR. I was not comfortable having this conversation with Kendra as I didn't want to be manipulated into saying something incorrect or for her to use my words against me.
>
> She kept asking the same question so I replied that I had not recommended her for a promotion. I said that the others that I hired have been more qualified as they had master's degrees. She commented that when the position was advertised it did not require a master's degree. I stated that a master's degree is preferred. I felt Kendra was blaming me for her not being promoted. I shared with Kendra an analogy that I saw on a cartoon comic years ago. She seemed to understand the analogy and stated, "I see what you are referring."

*Id.* at 26. On February 20, 2023, Thomas had the following entry:

> Throughout this discussion, Kendra kept asking the same questions, I was open with her that I had not recommended her for one of the three analyst positions or any analyst position since being the administrator. Kendra is not, in my opinion, capable of performing the duties of an analyst. She frequently has difficulties that others do not, particularly with the agenda program. She often does not follow instructions, she's not a team player, she makes excuses when asked to attend meetings with new staff, and she's makes simple tasks or requests into complex issues. She does not accept responsibility for her mistakes and blames others. Most of the times when I have asked Kendra to correct something she states that it was a "computer glitch" or blames someone else.
> For example, a couple of weeks ago, Kendra recalled an email that had a typo in Janna Omundson's name. I called her to ask her to add something additional to the email, she said, she recalled the email because the there was a computer glitch. I was flabbergasted, that she didn't say that it was a typo. While we all make mistakes, I haven't always documented them, but going forward, I think it will be imperative to document any conversation, problems, or computer issues that Kendra has.
>
> Kendra makes other employees feel uncomfortable and seems to have issues with newer employees and employees that are promoted. When Cait Steele was the administrative assistant to the administrator, Kendra had an issue with how she prepared the front desk calendar virtually every month. One month after Cait emailed the monthly calendar to the admins, Cait came to my office crying because Kendra did not agree with how she prepared the calendar. See documentation for September 30, 2022.
>
> In Kendra's email, she stated that she trained newly hired analysts and administrative assistants. In my opinion, Kendra seems to be unwilling to assist new analysts or administrative assistants. It seems that she attempts to avoid any assignments I give her, especially those involving new employees. On multiple occasions, Kendra has notify me that she is busy or not available after I have asked her to help.

*Id.* at 28. The documentation of North's poor attitude and negative interactions with other BLR employees is extensive and undisputed.

North refers to handwritten notes in which it is noted that Director Garrity said that North could not be promoted to analyst ever due to her persistent pestering as a "smoking gun." Doc. 28, p. 48 & Doc. 28-1, p. 81. In fact, many of the statements in the handwritten notes reflect North's

12

poor attitude and negative interactions. Doc. 28-1, pg. 81. It is noted that North complained to Estella Smith about her supervisor, Sheri Thomas, checking on her. *Id*. It is noted that North allowed legislators to sign both per diem sheets, forgot the seating chart causing a meeting not to run smoothly, employees "walk on eggshells" around North, and there is always a conspiracy. *Id*. The handwritten note is anything but a "smoking gun" and corroborates BLR's position that North was discriminated against. The undisputed material facts show that BLR did not believe North to be qualified to be promoted to an analyst position due to North's negative interactions and poor attitude.

      **(b)    Even if North were qualified for a legislative analyst position, Caitlyn Steele and Ray Terry were more qualified applicants.**

North's argument that she was more qualified than Steele and Terry is based entirely on being employed as an administrative assistant for several years. North mistakenly argues that Steele was promoted in violation of BLR Policy. The undisputed material facts show that Steele and Terry were both more qualified than North.

Steele was hired at BLR as an administrative assistant on February 17, 2020. Steele was promoted to Administrative Assistant to the Administrator on October 4, 2021. Steele was promoted to Legislative Analyst II on November 21, 2022. Steele was able to be promoted directly to Legislative Analyst II because she has a master's degree. See Doc. 28-1 (showing that Steele has a master's degree). None of Steele's promotions occurred within a year of her prior promotion so the promotions did not violate BLR policy.

More qualified applicants were promoted/hired for the Legislative Analyst positions North applied for in October 2022. Steele had a master's degree and did not have a documented history of negative interactions with her supervisor and a poor attitude. Ray Terry had a master's degree and was not promoted but was hired from the United States Postal Service. Doc. 17-17, p. 16 (p.

13

64, ln. 5-13). The undisputed material facts demonstrate that North was not qualified for the Legislative Analyst position. The undisputed material facts demonstrate that Steele and Terry were more qualified for the Legislative Analyst position than North. Being more qualified also means Caitlyn Steele and Ray Terry were not similarly situated with North.

Even if North could she was qualified for the Legislative Analyst position and that a similarly qualified employee, not part of a protected group, was promoted instead; BLR had a legitimate non-discriminatory reason for not promoting North which is her documented negative interactions with her supervisor and her poor attitude. The undisputed material facts demonstrate that BLR is entitled to summary judgment as to North's failure to promote claims.

**(4)  North's termination was not due to race discrimination.**

North cannot establish a prima facie case that her termination was the result of race discrimination. It is undisputed that an independent investigator and the Executive Subcommittee found North violated several BLR policies including recording a conversation with her supervisor. North argues that there is no evidence that she recorded the conversation. The email with the transcript of the conversation shows it was reasonable for BLR to believe North recorded the conversation. See Doc. 28-1, pp. 53-55. Even if BLR was wrong and North did not record the conversation with Sheri Thomas, the termination is not the result of discrimination.

North cannot point to any similarly situated employee who was treated differently than North. In fact, a former white employee of BLR was terminated upon a finding that the employee recorded a meeting without disclosing that she was doing so. Doc. 19, ¶ 41. The undisputed facts demonstrate that North cannot establish a prima facie case for discrimination.

Even if North could establish a prima facie case of discrimination, BLR had a legitimate nondiscriminatory reason for terminating North – violation of policy and insubordination. The undisputed material facts demonstrate that BLR had a legitimate nondiscriminatory reason for terminating North. BLR is entitled to summary judgment as to North's claim that she was terminated due to discrimination.

**(5)     BLR did not retaliate against North.**

North cannot establish a causal link between any complaints she made and not being promoted or being terminated. There is no evidence that North was not promoted for any reason other than more qualified applicants were selected. There is no evidence that North was terminated for any reason other than violation of policy.

North seems to relay mostly on anecdotal stories from other African American employees and broad claims of systemic racism without any proof. The experiences of other employees cannot establish a prima facie case of retaliation or discrimination. Nothing about the 2020 investigation or North's 2020 complaint had anything to do with alleged discrimination or protected conduct. See Doc. 28-1, pp. 34-43. An employees general complaints of mistreatment are not protected. *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007). BLR is entitled to summary judgment as to North's retaliation claim.

## Conclusion

For the foregoing reasons as well as the reasons set forth in BLR's Brief in Support of Motion for Summary Judgment, BLR is entitled to summary judgment as to all of North's discrimination and retaliation claims.

Respectfully submitted,

TIM GRIFFIN
Attorney General

Carl F. "Trey" Cooper, III
Ark Bar No. 2007294
Senior Assistant Attorney General
Office of the Arkansas Attorney General
BOB R. BROOKS JR. JUSTICE BUILDING
101 West Capitol Avenue
Little Rock, AR 72201
Phone:  (501) 682-3658
Fax:      (501) 682-2591
Email:  trey.cooper@arkansasag.gov

*Attorneys for Defendant,*
*Bureau of Legislative Research*